## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                        )
**NEXTSUN ENERGY LITTLETON, LLC,**      )
                                        )
      **Plaintiff,**          )      **Civil Action No.**
                                        )      **18-11180-FDS**
      **v.**                 )
                                        )
**ACADIA INSURANCE COMPANY,**           )
                                        )
      **Defendant.**          )
_____)


### MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION
### FOR PARTIAL SUMMARY JUDGMENT AND
### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**SAYLOR, C.J.**

      This is an action to recover under an insurance policy.  Jurisdiction is based on diversity

of citizenship.  Plaintiff NextSun Energy Littleton, LLC, is a company that operates solar panel

arrays.  A NextSun array experienced a fire on May 31, 2016, that damaged 88 solar panels.  The

Town of Littleton ordered that more than 11,000 of NextSun's undamaged solar panels be

suspended from operation until they were thoroughly tested, inspected, and repaired where

necessary.  NextSun seeks to recover lost energy-generating income for the period of the

mandated shutdown of all of its solar panels, pursuant to an insurance policy issued by defendant

Acadia Insurance Company.  Acadia maintains that the policy only covers the lost income from

the 88 fire-damaged solar panels.

      NextSun has brought this suit asserting claims for breach of contract, breach of the

implied covenant of good faith and fair dealing, and unfair and deceptive trade practices in

violation of Mass. Gen. Laws ch. 93A and 176D.  Acadia has moved for summary judgment on

all counts.  NextSun has opposed the motion and moved for partial summary judgment on its breach of contract claim.  For the reasons set forth below, Acadia's motion will be granted in part and denied in part, and NextSun's motion will be granted.

## I.      Background

The following facts are as set forth in the record and are undisputed except as noted.

### A.      Factual Background

#### 1.      NextSun

NextSun Energy Littleton, LLC, is a Massachusetts company that operates solar panel arrays.  (Pl. SMF ¶¶ 1-2).  Jacob Laskin is its registered agent, sole member, and manager.  (Def. Statement Concerning Diversity Jurisdiction).

NextSun owns and operates two rooftop solar panel arrays at Distribution Circle in Littleton, Massachusetts.  (Pl. SMF ¶ 4).  Array No. 1 has 5,742 panels, and Array No. 2 has 6,050 panels.  (Id.).  NextSun sells the electricity generated by the solar panel arrays to the Town of Littleton's Electric Department.  (Pl. Ex. 5, Lawler Dep. at 10-15; Pl. Ex. 20, MDD Loss Estimate; Pl. Ex. 21, MDD Revised Loss Estimate).

#### 2.      The Insurance Policy

From October 10, 2015, to October 10, 2016, NextSun was insured under a Commercial Inland Marine Insurance Policy issued by Acadia Insurance Company.  (Def. SMF ¶ 3; Def. SMF Ex. 2, Policy).

Form IM 8060-07-11 of the policy is captioned "Renewable Energy Generating Equipment Coverage," and generally insures the risks of direct physical loss or damage to NextSun's solar panels.  (Policy at 16, 20, 31).  The policy also provides coverage for "Energy Generating Income," an optional coverage that NextSun purchased separately.  (Policy at 17-18;

Pl. SMF ¶ 39; Def. SMF ¶ 4).[1]

This lawsuit arises from a dispute over the "Energy Generating Income" provision, which

provides as follows:

> When direct physical loss or damage caused by a covered peril occurs to "renewable energy generating equipment" at a location described on the "schedule of coverages," and that direct physical loss or damage causes an "interruption" of "your" "renewable energy generating equipment," "we" pay for the actual loss of surplus power income (including loss of credits and rebates) incurred during the "interruption period" applicable to the "renewable energy generating equipment."

(Policy at 17).

The "Energy Generating Income" provision contains an "Ordinance or Law" sub-section,

which provides:

> 1) Coverage for Energy Generating Income is extended for the increased time of "interruption" caused by the enforcement of any ordinance, law, or decree that:
>
>> (a) regulates the construction, use, or repair of covered "renewable energy generating equipment"; or
>>
>> (b) requires the demolition of covered "renewable energy generating equipment," in part or in whole, not damaged by a covered peril.
>
> 2) Coverage is not extended to include "interruption" caused by the enforcement of any ordinance, law, or decree that:
>
>> a) is not in force at the time of loss . . . .

(*Id.*).

In addition, the policy contains an "Additional Time Exclusion" that limits Acadia's

Energy Generating Income coverage, as follows:

> "We" do not pay for any loss or additional expenses due to any increase in the 'interruption period' caused directly or indirectly by . . .

---

[1] The parties have used the terms "energy-generating income coverage" and "business interruption coverage" interchangeably.  (Def. Mem. 14).

a.  Additional Time—Additional time that would be required to replace or repair any part of covered "renewable energy generating equipment" due to:

. . . .

4)  improvements necessary to correct deficiencies of original construction, erection, or installation.

(*Id.* at 23-24).

The parties do not dispute that NextSun's solar panels are covered "renewable energy generating equipment" and that the fire is a "covered peril" that, in this case, caused "direct physical loss or damage" to the insured equipment.  (Pl. SMF ¶¶ 43-44).

### 3.     The Fire and Subsequent Action by the Town of Littleton

On May 31, 2016, a fire occurred on the roof of the NextSun facility at 1-3 Distribution Center Circle in Littleton.  The fire damaged approximately 88 of the 6,050 solar panels in Array No. 2.  (Def. SMF ¶¶ 8, 9, 21).  The fire was confined to a limited area, called a "string," which is one section of connected solar panels.  (Pl. Ex. 5, Lawler Dep. at 36-37; Pl. Ex. 7, Morehouse Dep. at 16-17).  The fire caused no damage to the 5,742 solar panels within Array No. 1.  (Def. SMF ¶ 9).

On June 1, 2016, officials from the Town of Littleton, including Bill Morehouse, the Wiring Inspector of the Littleton Building Department; Scott Wodzinski, the Littleton Fire Chief; and Nick Lawler, the Littleton Electric Light and Water Department ("LELWD") Assistant General Manager, came to the site to investigate the cause of the fire and meet with representatives of NextSun on site.  (Pl. SMF ¶¶ 7-9).[2]  As a result of that initial investigation

---

[2] The parties have used the terms "Electrical Inspector," "Wire Inspector," and "Wiring Inspector" interchangeably to describe Morehouse's role in the Littleton Building Department.  There is no dispute over his authority or responsibilities in that position. For the sake of clarity, the court will refer to his position as "Wiring Inspector," which is the term used by plaintiff in its filings and by Morehouse in his deposition.

and meeting, the LELWD ordered NextSun to halt all energy-generating activity on both arrays. (*Id.* ¶ 9). This is known as a "red-tag" order and it signals that the equipment may not be operated. (Lawler Dep. at 47-48, 62-64). Compliance with a red-tag order is mandatory, not discretionary. (*Id.* 62-64). The Fire Chief, Town Inspectors, and the LELWD all have the authority to issue such an order. (*Id.*).

On June 1, Town officials and NextSun developed a preliminary plan for the testing and inspection steps that would need to be completed before the LELWD would remove the red-tag order from each array. (Pl. Ex. 4, June 1 and 9, 2016 Lawler E-mails). On June 9, 2016, the LELWD removed its red-tag order from Array No. 1 and permitted NextSun to resume energy-generating activity on that array. (*Id.*; *see also* Pl. Ex. 3, NextSun's Answers to Acadia's Interrogatories ¶ 9).

The LELWD did not remove the red-tag order from Array No. 2 on June 9. Instead, it ordered that Array No. 2 undergo comprehensive testing, inspection, and repairs (if necessary) on all its panels and connectors before the red tag could be removed and the prohibition on energy-generating activity lifted. (Pl. SMF ¶¶ 12-13). Among other things, the LELWD required (1) notification from the Building Department that all the requirements of the Wiring Inspector had been satisfied, (2) notification from the Fire Chief that all his "issues had been resolved," (3) approval from the building owner to re-energize the array, and (4) assurances from NextSun that it had completed all the remedies required by the Fire and Building Departments and that the array was safe to re-energize. (*Id.*; *see also* Pl. Ex. 4, June 9, 2016 Lawler E-mail).

Bill Morehouse, the Wiring Inspector, required NextSun to evaluate every single electrical connection, and replace faulty connections if necessary, before the panels in Array No. 2 could be re-energized. (Pl. SMF ¶ 15). According to him, he issued that order because he

"was told that [the connectors] were the probable cause of the original fire . . . so . . . these connectors on the other parts of the roof were a major concern." (Pl. Ex. 7, Morehouse Dep. at 20-21). As the Wiring Inspector, he had the legal authority to order the suspension of power-generating activity. (*Id.* at 43-44). In a later letter, he summarized his actions as follows:

> As [a] result of the fire on the Littleton Distribution Center and damage to the rooftop solar generating equipment I ordered all the panels, electrical connections and associated systems be tested and a full re-commissioning of the system and associated documentation to be provided to me before I would allow the red tag to be removed from the utility transformer. This transformer is the one which would provide service to the solar system and allow it to return to operation. I also noted that the panels that were to replace the ones damage[d] in the fire had to be up to current electrical codes.

(Def. Ex. 11, Mar. 7, 2017 Morehouse Letter).

Scott Wodzinski, the Fire Chief, required NextSun to repair every connector on the rooftop that had shown signs of "arcing and burn" before he would permit the resumption of energy-generating activities on Array No. 2. (Pl. SMF ¶ 14; Pl. Ex 6, Wodzinski Dep. at 28).[3] Until those issues had been addressed, Wodzinski indicated he would assert his lawful authority as fire chief, pursuant to state fire regulations, to enforce the stoppage order prohibiting energy-generating activities at the array. (Pl. SMF ¶ 14; Wodzinski Dep. at 29-30).[4]

As part of the investigation of the fire, at least two outside vendors evaluated the NextSun site. Acadia hired Loss Solutions Group ("LSG"), an expert in electrical equipment with experience in solar panels, to assess the cause of loss and the likely cost of repair. (Pl. SMF ¶¶ 24-25). On June 3, 2016, representatives of LSG met with representatives of NextSun and RAK

---

[3] It appears that a number of solar panels, not just the 88 fire-damaged ones, showed signs of arcing and burn. (Def. Ex. 5, Bay4 Energy Service Report). Wodzinski was unable to state whether the signs of arcing and burn existed prior to the fire or were caused by the fire. (Wodzinski Dep. at 36).

[4] Wodzinski stated that the following fire codes and regulations applied to the Town of Littleton and granted him the authority to order a shutdown of the arrays: International Fire Code 2009, the Board of Fire Prevention Regulations, Chapter 527 of the Massachusetts Code of Regulations, and Mass. Gen. Laws ch. 148, § 26B. (Wodzinski Dep. at 30-31).

Solar Services, the contractor that NextSun had hired to do repair work.  (*Id.* ¶ 26).  On June 8, LSG issued its report.  (Pl. Ex. 9, LSG Report).  It reported that the fire may have been caused by loose connectors, a cut in the wiring, or a different, unidentified problem.  (*Id.* at 2).  LSG characterized the Town's order to suspend energy production pending testing and inspection of all connectors as "responsible" and a "good business decision for the insured to prevent any future loses of a similar nature."  (*Id.*).  However, it found that widespread testing was "not required to put the system back online" and did not account for such testing in its loss estimate. (*Id.*).

Another outside vendor, Bay4 Technical Services, inspected the site and met on June 9, 2016, with Fire Chief Wodzinski, Wiring Inspector Morehouse, a representative of the building management firm, and Robert Giguere of RAK Solar Services, the contractor that NextSun had hired to perform repairs.  (Pl. SMF ¶¶ 18-19; Def. Ex. 5, Bay4 Service Report).  On June 14, Bay4 issued a report assessing the fire damage, the likely origin of the fire, and the condition of the solar panels.  (Pl. SMF ¶ 18).  Bay4 was not able determine the cause of the fire with any certainty.  (Bay4 Service Report at 2).  It reported that the "combiner box" associated with the fire showed evidence of water damage and blown fuses.  (*Id.* at 2-6).  It also reported that multiple connectors between panels showed signs of arcing and burn.  (*Id.*).  Finally, Bay4 reported seeing "multiple indications of poor workmanship" in the connectors, primarily involving connectors that were not sufficiently tight or had excessive exposed copper.  (*Id.*). Bay4's recommendation was to check every connection in the entire array and to repair loose connections when necessary.  That recommendation matched the actions ordered by the Town. (*Id.*).

By July 11, 2016, NextSun and its contractors had completed the necessary testing and

repairs to comply with the Town's orders.  (Pl. SMF ¶ 31).  The testing included inspecting every "string or row" of panels with a team of two people and generating a "testing report," a document that the Wiring Inspector required before allowing the system to be turned back on. (Morehouse Dep. at 33, 44-45).  The repairs included tightening connections, moving the connections underneath the panels to prevent future exposure to bad weather, and managing and organizing cables that showed signs of sun damage or wear and tear.  (*Id.* at 45).

On July 11, 2016, the Fire Chief and Wiring Inspector confirmed that they had received the necessary confirmation of testing and repairs, and authorized the resumption of power generation.  (Pl. SMF ¶ 31).  Accordingly, the LELWD removed the red-tag order and permitted NextSun to resume energy-generating operations on Array No. 2.  (*Id.* ¶ 32).

As a result of the orders of the Town, all 5,742 panels in Array No. 1 were offline for inspection for the 9-day period between June 1 and June 9, 2016.  (Pl. SMF ¶ 71; Pl. Ex. 20, MDD Loss Estimate; Pl. Ex. 21, MDD Revised Loss Estimate).  All 6,050 panels in Array No. 2 (the fire-damaged array) were offline for inspection for the 41-day period between June 1 and July 11, 2016.  (*Id.*).  In addition, the 88 fire-damaged panels in Array No. 2 were offline for a 133-day period from June 1, 2016, until they were replaced on October 11, 2016.  (Pl. SMF ¶ 72; MDD Revised Loss Estimate).

### 4.    The Insurance Dispute and Calculation of Lost Energy-Generating Income

NextSun timely submitted an insurance claim to Acadia requesting reimbursement for (1) $41,044.30 in physical damage to the 88 solar panels damaged by the fire and (2) $264,929.44 in lost energy-generating income resulting from the Town's red-tag order.  (Pl. SMF ¶¶ 48-49).  The parties resolved the claim for direct physical damage from the fire by agreement on March 27, 2017, for the sum of $31,044.30, which reflected a total claim of

$41,044.30 for replacement solar panels and the labor to install them, less the $10,000 deductible.  (Def. SMF ¶ 24).

However, the parties did not reach an agreement on the claim for lost energy-generating income.  (*Id.*).[5]  NextSun asserts that it lost income from (1) the loss of the panels damaged by the fire and (2) the red-tag order suspending power-generating activities of non-damaged panels, and that the loss totals $264,929.44.  (Pl. SMF ¶¶ 33-34, 49-50).  Acadia does not dispute the amount of loss; its position is that lost income due to the fire-damaged panels ($6,958) is covered, but total lost income due to the red-tag order ($264,929.44) is not.  (Def. Counter-SMF ¶¶ 33-34, 49-50).  The difference between NextSun's estimate of $264,929.44 in covered lost energy-generating income and Acadia's estimate of $6,958 in covered lost energy-generating income is $257,971.44, the amount in dispute.  (*Id.*).

Over the course of 2017, Acadia attempted to resolve its dispute with NextSun over the energy-generating income claim by seeking advice from multiple internal and external sources. NextSun provided Acadia with a signed letter from Bill Morehouse, the Wiring Inspector, in which he summarized his order to "red tag" the solar panels until they were thoroughly tested. (Pl. SMF ¶¶ 51-52).  On March 8, 2017, the Acadia claims adjuster assigned to NextSun, Wallace Nichols, sought advice from his supervisor, Michael Beatty, on whether the Morehouse letter "would trigger law and ordinance coverage under the [energy-generating] income policy." (Pl. SMF ¶ 53; Pl. Ex. 15, Mar. 8, 2017 Beatty and Nichols E-mails).  Beatty responded that he did not interpret Morehouse's order as the enforcement of an "ordinance or law" because he had

---

[5] In the e-mail exchange concerning the resolution of the physical damage claim, Wallace Nichols, the claims adjuster for Acadia, stated that the insurer "will not pay for supervision time for checking other connections [that were not damaged by the fire]."  (Def. Ex. 10, Mar. 24-29, 2017 Nichols E-mails at 5).  Jacob Laskin, on behalf of NextSun, responded, "While we accept the total amount on the property [damage] portion of this claim, we will be pursuing [Acadia's refusal] to pay for supervision time for checking other connections under the pending business interruption claim."  (*Id.* at 5).  The parties have used "energy-generating income coverage" and "business interruption coverage" interchangeably.

not stated that his direction was "based on a specific ordinance or law." (Pl. SMF ¶ 54). Nichols

replied that he was "not familiar with this type of coverage at all" and further stated, "I

understand that they have not shown us any specific law or ordinance that would trigger the

coverage, but would [the Morehouse letter] be a decree? If not, why not?" (Pl. SMF ¶ 61; Pl.

Ex. 18, Mar. 13, 2017 Beatty and Nichols E-mails).

On March 8, 2017, Nichols consulted Peter Breglio of NPE Consultants, an engineering

firm that Acadia had hired as an expert to evaluate the loss and NextSun's damages. (*Id.* ¶ 55).

Breglio opined that Morehouse's authority to require testing before lifting the red-tag order

clearly stemmed from "national, state, and local codes as a blanket option given to the inspection

authority having final authority." (*Id.* ¶ 56). On March 12, NPE issued an engineering report to

Acadia opining that "the Town of Littleton Electrical Inspector's (Authority Having Jurisdiction)

request for a full re-commissioning and testing of the system was based on the requirement to

replace/repair all existing PV array panel connections, combiner boxes and other associated

components due to poor installation practices and workmanship of the pre-loss NextSun roof PV

system." (*Id.* ¶ 60; Pl. Ex. 17, NPE Report).

On March 14, 2017, Acadia supervisor Michael Beatty reviewed the NextSun file,

including the NPE report, and memorialized his conclusions in the Claim File Notes: "With

regard to ordinance or law, the [NPE] engineer report . . . is absolutely on point, meaning that

although the local authority is decreeing that a full replace/repair of the existing [solar panel

connectors] . . . be performed, it is not due to the [fire] loss but rather due to the poor

workmanship during installation which is a pre-loss condition. This is not a trigger of the

additional coverage for ordinance or law." (Pl. SMF ¶ 63; Pl. Ex. 19, Claim File Notes).

On March 16, 2017, Acadia sent a letter to NextSun denying its claim for lost energy-

generating income.  The letter stated as follows:  "[W]hile the local authority sent you a decree stating that a full replace/repair of the existing PV array panel connections, combiner boxes and other associated components be performed, this is not due to the loss, but rather due to the poor workmanship during installation which is a pre-loss condition."  (Pl. SMF ¶¶ 65-67; Pl. Ex. 13, Mar. 16, 2017 Letter from Acadia to NextSun).  The letter stated that this "does not qualify for coverage" and excerpted the energy-generating income portion of the insurance policy.  (*Id.*).

Acadia hired Matson Driscoll & Damico ("MDD"), a forensic accounting firm, to analyze NextSun's claim for lost energy-generating income.  (Def. SMF ¶ 20).  MDD issued a final report on April 12, 2017, calculating that NextSun's lost energy-generating income was $6,958.  (*Id.*).  It based that calculation on Acadia's instruction that MDD only consider the lost potential income for the 88 panels that were actually fire-damaged and needed to be replaced over the 133-day period that those panels were offline.  (*Id.* ¶¶ 20-21; Pl. Ex. 21, MDD Revised Estimate).  As directed by Acadia, MDD did not calculate lost potential income from the 5,742 panels in Array No. 1 and 6,050 panels in Array No. 2 that were offline for inspection due to the red-tag order.  (Def. SMF ¶ 21; MDD Revised Estimate).  Its report stated, "All coverage interpretation under the insurance policy, including judgment regarding the length of the period of restoration, is deferred to the discretion of the adjuster."  (MDD Revised Estimate).  Acadia claims adjuster Wallace Nichols sent the report to NextSun, summarizing that "there is no coverage for the time you were down inspecting/repairing the connections to all the undamaged panels.  We will only cover the panels that were directly damaged or had to be replaced as a result of the fire."  (Pl. SMF ¶ 70; Pl. Ex. 20, Mar. 29, 2017 Nichols E-mail).

On April 14, 2017, Nichols consulted with Acadia's in-house counsel, Susan Beck, about whether NextSun's claim for energy-generating income was covered under the policy.  (Pl. SMF

¶ 73).  Beck could not determine if there was coverage because she did not know if the town officials' testing order "was driven primarily by ensuring the insured's compliance with a particular electrical code, or simply by a desire to prevent future issues by ensuring that the system would operate as expected."  (Pl. SMF ¶ 76; Pl. Ex. 22, Apr. 14-20, 2017 Beck and Nichols E-mails).  She suggested that NextSun "direct [Acadia] to the exact code, law, or statute that he claims was being enforced."  (*Id.*).

NextSun hired a loss adjuster, who commissioned a report from Associated Design Partners Inc. ("ADP") on interpretation of the state law or code supporting the Town's red-tag order.  (Pl. SMF ¶ 78; Pl. Ex. 23, ADP Report).  The ADP report analyzed the following laws and concluded that they provided the necessary grant of authority for the Town officials to issue the red-tag order:

(1) International Existing Building Code 2009, §§ 405, 603.  The ADP report found that the NextSun array was an "existing commercial use building" whose restoration following the fire was a "Level 1 alteration."  (ADP Report at 3-4).  Section 603 requires that Level 1 alterations "shall be done in a manner that maintains the level of fire protection provided."  (*Id.* at 4).

(2) International Fire Code 2009, § 101 (Scope and General Requirements), § 104 (General Authority and Responsibilities), § 109 (Violations), § 110 (Unsafe Buildings), § 111 (Stop Work Order); § 4601 (Construction Requirements for Existing Buildings).  (*Id.* at 4-6).  ADP summarized the International Fire Code requirements as follows:  "The loose wire connections are considered an *unsafe* condition that is a code violation.  Because of the fire, these unsafe conditions were disclosed and are considered a code violation.  Accordingly, the AHJ [Authority

Having Jurisdiction] is required to notify the owner and enforce corrective measures for compliance.  As is spelled out by these Code sections, the AHJ has extensive authority to enforce the fire code to address unsafe conditions."  (*Id.* at 6).

(3) Massachusetts Board of Fire Prevention Regulations, 527 C.M.R.  (*Id.* at 6-7).  The ADP report stated, "[I]f the Town identifies conditions hazardous to life or property or a potentially *unsafe* condition is disclosed, the AHJ has the authority to intervein [sic] and demand testing and corrective measures."  (*Id.* at 7).

(4) Mass. Gen. Laws ch. 148, § 26B, Fire Protection.  (*Id.*).  The ADP report found that the relevant section included the provision, "[T]he head of the fire department . . . shall enforce the provisions of this section [concerning fire safety and smoke detection]."  (*Id.*).

The ADP report concluded:

> Based on the above code study and Massachusetts State Law review, it is my opinion that the local Code Enforcement Officer (CEO) and/or Electrical Inspector (EI) are both considered to be the Authority Having Jurisdiction (AHJ) and interpretation of the code falls within their authority. In this case, I believe the EI acted within his authority in a reasonable, correct, and justified way when he required the arrays be shut down until testing and improvements could be made.

(*Id.* at 7).  NextSun submitted the ADP report to Acadia for its review on May 16, 2017.  (Pl. SMF ¶ 78).

On May 24, 2017, NextSun submitted an advisory opinion by Linda Robinson at the Insurance Risk Management Institute to Acadia in support of its claim.  (Pl. SMF ¶ 82).  The e-mail stated, "Based on the language of the . . . policy, my opinion is that the increase in [NextSun's] business income loss, due to the extended period of restoration resulting from the need to comply with the building code official's requirements, should be covered."  (*Id.* ¶ 83).

On June 2, 2017, Acadia referred NextSun's claim to outside counsel to determine

whether the "ordinance or law" provision covered the loss.  (Pl. SMF ¶ 84).

On June 30, 2017, Acadia sent a second letter to NextSun denying the claim.  (Pl. SMF ¶¶ 85-89; Pl. Ex. 26, June 30, 2017 Letter from Acadia to NextSun).  That letter stated that Acadia was denying the claim for lost energy-generating income because (1) the requirement to inspect and repair before removing the red-tag order was not the enforcement of an "ordinance, law, or degree," and (2) "the cost of inspecting improperly-installed arrays was due to the negligent workmanship of the contractors that did this work for NextSun in the past and was not caused by the May 31, 2016 fire."  (*Id.*).

On July 11, 2017, NextSun produced an updated report from ADP responding to the June 30, 2017 claim-denial letter.  (Pl SMF ¶¶ 90-91; Pl. Ex. 27, Second ADP Report).  First, it responded to the claim that the inspection-and-repair requirements were not mandated by any "ordinance, law, or decree" by noting that the International Existing Building Code, International Fire Code, International Building Codes, and other laws summarized in its first report were in place and had been adopted by the Town at the time of loss.  (Second ADP Report at 3-6).  Those codes "specifically require dangerous conditions to be corrected and empower the AHJ [authority having jurisdiction] to issue decrees to enforce the codes."  (*Id.* at 6).  Second, the ADP report responded to the claim that the inspection-and-repair requirements were caused by negligent workmanship rather than fire damage by noting that the text of the policy did *not* stipulate that it only covered lost income from fire-damaged equipment.  (*Id.* at 4).  Even assuming Acadia's reading of the policy was correct, the defects in the NextSun solar panels, which required inspection and repair of the entire array, were not necessarily caused by faulty workmanship.  (*Id.* at 3).  Those non-workmanship issues included "loose electrical connections due to normal expansion and contraction . . . due to normal exposure to fluctuating external

temperature and weather conditions and/or fluctuating internal component temperatures from normal use of the array." (*Id.*).

On October 2, 2017, Acadia's outside counsel, Morrison Mahoney LLP, sent NextSun a third letter formally stating Acadia's reasons for denying the insurance claim, which were largely the same as those stated in the June 30, 2017 letter: first, because the re-wiring and inspection of the panels were not required by any "ordinance, law, or decree"; and second, because the conditions that necessitated the re-wiring and inspection were due to negligent installation and pre-dated the fire damage. (Pl. SMF ¶ 92).

It is undisputed that Acadia has never received any other claims from a policyholder for the "ordinance or law" subclause of the "energy-generating income" coverage. (Pl. SMF ¶ 98; Def. Counter-SMF ¶ 98).

On February 9, 2018, as a result of the disagreement between Acadia and NextSun over the amount of the energy-generating income claim, NextSun issued a demand for a statutory reference proceeding pursuant to Mass Gen. Laws ch. 175, §§ 99, *et seq.* (Pl. SMF ¶ 99). Acadia declined the request to participate in the reference proceeding, and sent NextSun a letter stating:

> The reference process . . . exists to resolve disputes with respect to the value of a covered loss. A reference is not required or appropriate with respect to disputes concerning whether a loss is covered at all. *See* Mass. Gen. Laws ch. 175, § 101E. The dispute centers on our conflicting interpretations of the Ordinance or Law language in the Acadia policy and is therefore not appropriate to be resolved by reference.

(*Id.* ¶ 100; Pl. Ex. 32, Feb. 14, 2018 Letter from Acadia's Counsel to NextSun's Counsel).[6]

---

[6] When asked why Acadia declined to participate in the reference process, the Rule 30(b)(6) deponent for Acadia, Keith Gleason, reiterated that "the dispute between the parties in this case is over coverage and not the amount of loss" and "it appears that [Acadia] made that decision that there isn't a dispute over the amount." (Pl. SMF ¶ 102; Pl. Ex. 10, Gleason Dep. at 204-05).

### B.     Procedural Background

On May 15, 2018, NextSun filed suit against Acadia in Massachusetts Superior Court asserting three claims:  breach of contract (Count 1), breach of the implied covenant of good faith and fair dealing (Count 2), and unfair and deceptive trade practices in violation of Mass. Gen. Laws ch. 93A and 176D (Count 3).  On June 6, 2018, Acadia timely removed the suit to this court on the basis of diversity of citizenship pursuant to 28 U.S.C. §§ 1332, 1446(a).

Acadia has moved for summary judgment on all counts and NextSun has cross-moved for summary judgment on the breach of contract claim.

## II.     Legal Standard

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Mesnick v. General Elec. Co.,* 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party."  *Medina-Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted).  In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party.  *See O'Connor v. Steeves,* 994 F.2d 905, 907 (1st Cir. 1993).  When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (quotations omitted).  The nonmoving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence."  *Id.* at 256-57.

III.    **Analysis**

A.      **Breach of Contract**

Under Massachusetts law, "[t]he proper interpretation of an insurance policy is a matter of law to be decided by a court, not a jury." *U.S. Liability Ins. Co. v. Benchmark Constr. Servs., Inc.*, 797 F.3d 116, 119 (1st Cir. 2015) (quoting *Boazova v. Safety Ins. Co.*, 462 Mass. 346, 350 (2012)).[7]  When "the material facts upon which a coverage question is based are not genuinely in dispute, the application of the policy to those facts is likewise a question of law . . . properly resolved on summary judgment." *B & T Masonry Const. Co. v. Public Serv. Mut. Ins. Co.*, 382 F.3d 36, 38-39 (1st Cir. 2004).

Under Massachusetts law, an insurance policy is to be "construe[d] . . . under the general rules of contract interpretation[,] . . . begin[ning] with the actual language of the policies, given its plain and ordinary meaning." *AIG Property Cas. Co. v. Cosby*, 892 F.3d 25, 27 (1st Cir. 2018) (quoting *Brazas Sporting Arms, Inc. v. American Empire Surplus Lines Ins. Co.*, 220 F.3d 1, 4 (1st Cir. 2000)).  "Every word in an insurance contract must be presumed to have been employed with a purpose and must be given meaning and effect whenever practicable . . . without according undue emphasis to any particular part over another," and when in doubt, one must consider "what an objectively reasonable insured, reading the relevant policy language, would expect to be covered." *Boston Gas Co. v. Century Indem. Co.*, 454 Mass. 337, 355-56 (2009) (internal citations omitted).

All ambiguities in an insurance policy "are to be construed against the insurer and in favor of the insured." *U.S. Liability*, 797 F.3d at 120.  An ambiguity "arises when there is more

---

[7] The policy in dispute was issued in Massachusetts to a Massachusetts company, and the underlying suit was filed in Massachusetts courts asserting violations of Massachusetts state laws.  The parties both acknowledge that Massachusetts law applies to this case.  *See Artuso v. Vertex Pharm., Inc.*, 637 F.3d 1, 5 (1st Cir. 2011) ("In determining which state's law applies, a diversity court is free to honor the parties' reasonable agreement.").

than one rational interpretation of the relevant policy language," but "is not created simply because a controversy exists between parties, each favoring an interpretation contrary to the other." *Boston Gas Co.* at 356 n.32 (internal citations omitted).  Furthermore, "more specific contract terms ordinarily control over more general contract terms" under Massachusetts law. *Easthampton Congregational Church v. Church Mut. Ins. Co.,* 916 F.3d 86, 92 (1st Cir. 2019) (internal citations omitted).  "Therefore, if a policy provision is found to provide for coverage, then general exclusion clauses are inapplicable." *Id.*

As a general matter, the insured party has "the initial burden of showing that the case involves a generally covered risk under the policy." *Stor/Gard, Inc. v. Strathmore Ins. Co*, 717 F.3d 242, 247 (1st Cir. 2013) (citing *Boazova*, 462 Mass. at 351).  Should the insured party meet that burden, "the burden shifts to the insurer . . . to show an exclusion applies." *Id.*  Exclusions in a policy, like ambiguities, must be "strictly construed against an insurer." *Preferred Mut. Insurance Co. v. Gamache*, 426 Mass. 93, 94 (1997).  Should an insurer satisfy its burden of showing that an exclusion applies, "the burden shifts back to the insured[] to show an exception to the exclusion holds sway." *Stor-Gard* at 247.

Defendant contends that summary judgment is appropriate on the breach of contract claim for three reasons:  (1) because the "ordinance, law, or decree" authorizing the red-tag order was not in force at the time of loss; (2) because the Town issued its red-tag order due to deficiencies of original construction, not due to fire damage; and (3) because the "additional time" exclusion applies.  Plaintiff opposes those arguments and further contends that summary judgment in its favor is appropriate because the plain terms of the contract provide coverage.

      1.     **Whether the "Ordinance, Law, or Decree" Authorizing the Red-Tag Order Was in Force at the Time of Loss**

The "energy-generating income" coverage of the insurance policy provides that if a

"direct physical loss or damage by a covered peril occurs to renewable energy generating equipment," and that "direct physical loss or damage causes an interruption" of that equipment, defendant will pay for "loss of surplus power income" incurred during the "interruption period." (Policy at 17).  The parties agree that this section of the policy applies, at least initially, to plaintiff's loss:  the fire was a "covered peril" that caused "direct physical loss or damage" to equipment and immediately caused an "interruption" of the equipment.

The "ordinance or law" subsection of the "energy-generating income" coverage provides that "coverage for energy generating income is extended for the increased time of 'interruption' caused by enforcement of any ordinance, law, or decree that regulates the construction, use or repair of covered 'renewable energy equipment."  (Policy at 17).  However, there is a specific exclusion:  "Coverage is not extended to include the 'interruption' caused by enforcement of any ordinance, law, or decree that is not in force at the time of loss."  (*Id.*).

Here, defendant does not contest that the Town officials who issued the red-tag order had the authority to do so, nor that the red-tag order constituted "enforcement of [an] ordinance, law, or decree."[8]  Rather, defendant contends that the exclusion applies because "the very order which forms the basis of [plaintiff's] claim for the disputed EGI loss issued after the loss, and was not in force at the time of the loss."  (Def. Mem. at 6).  It bases that argument on the fact that Town officials issued the orders on June 1 and 9, 2016, mandating a complete shutdown of the arrays until the completion of testing, while the fire occurred on May 31, 2016.  Therefore, defendant contends, "the order was not in force at the time of the loss."  (*Id.* at 4).

---

[8] This contrasts with Acadia's position predating the litigation, in which they stated, at times, that there was no coverage because the red-tag order was not based on any specific ordinance, law, or decree.  (*See, e.g.,* Pl. SMF ¶¶ 85-89, 92; Pl. Ex. 26, June 30, 2017 Letter from Acadia to NextSun; Pl. Ex. 28, Oct. 2, 2017 Letter from Acadia's Counsel to NextSun's Counsel).

That line of reasoning ignores the "plain and ordinary" language of the policy.  *See AIG Property Cas. Co. v. Cosby*, 892 F.3d 25, 27 (1st Cir. 2018).  Nowhere does the insurance policy actually state that it excludes coverage when an "order" postdates the loss; rather, it should be read to exclude coverage only when the underlying "ordinance, law or decree" enforced by the order postdates the loss.  In the sentence, "Coverage is not extended to include interruption caused by enforcement of any ordinance, law, or decree that is not in force at the time of the loss," the adjectival phrase "that is not in force at the time of the loss" should be read to modify its direct antecedent, "ordinance, law, or decree," *not* "enforcement."  When interpreting a phrase, one should not "divorce a noun from the modifier next to it without some extraordinary reason."  *Lopez v. Gonzales*, 549 U.S. 47, 56 (2006).

Defendant has given the court no extraordinary reason to stray from that basic principle of textual interpretation.  Indeed, defendant's reading of the policy is illogical and would render the "ordinance or law" provision meaningless.  The "ordinance or law" provision provides coverage when "enforcement of [an] ordinance, law, or decree" *extends* the period of energy-generating income loss that was originally triggered by the physical "loss" itself.  (Policy at 17).  That requires that the physical loss must occur first, causing a period of income interruption, which is subsequently "extended" for the "increased time of interruption caused by enforcement of [an] ordinance, law, or decree."  (*Id.*).  Because municipal inspectors are not gifted with clairvoyance, it would not be reasonable to read the policy, as defendant suggests, to apply only when the "orders" or "enforcement" actions of officials responding to a physical loss—for example, requiring that the site suspend operations for fire inspection or mandating safety standards for repair construction—predate the loss itself.  That interpretation flies in the face of the requirement that "every word in an insurance contract . . . must be given meaning and effect

20

whenever practicable." *Boston Gas Co. v. Century Indem. Co.*, 454 Mass. 337, 355 (2009). Therefore, the exclusion applies only when the "ordinance, law, or decree" itself, *not* the enforcement action, was not in force at the time of the loss.

Thus, the exclusion, as interpreted, does not apply in these circumstances.  The ordinances and laws that authorized the red-tag order were clearly in force at the time of the fire. The ADP report concluded that the International Existing Building code and International Fire Code were "in force" in Massachusetts at the time of loss, as the Town of Littleton had adopted those regulations.  (Pl. SMF ¶ 78; Pl. Ex. 23, ADP Report).  Those codes, along with 527 C.M.R. (the Massachusetts Board of Fire Prevention Regulations) and Mass. Gen. Laws ch. 148, § 26B (Fire Protection), granted authority to Town officials to enforce the codes by requiring plaintiff to suspend all of its energy-generating operations until it completed the mandated testing, inspection, and repair steps.  (*Id.*).

In sum, plaintiff has met its burden of showing that the "ordinance or law" provision of the "energy-generating income" coverage applies to its claim, and defendant has not met its burden of showing that the "in force at the time of loss" exclusion applies.

> **2.**     **Whether the Energy-Generating Income Provision Covers Losses Caused by Deficiencies of Original Construction**

Defendant next contends that plaintiff may not recover for energy-generating income loss resulting from the Town's red-tag order because the order itself was not caused by the fire, but by deficiencies of original construction and faulty workmanship.  Defendant argues that both the text of the policy and the weight of case law support its reading of the policy.  Plaintiff counters that defendant's textual interpretation is flawed because it reads a causality requirement into the policy that does not exist.

The text of the policy does not support defendant's interpretation that the enforcement of

the law or ordinance must be *caused by* covered physical loss or damage.  It is fairly straightforward to analyze the "energy-generating income" provision step by step.  First, the policy provides, "When direct physical loss or damage caused by a covered peril occurs to 'renewable energy generating equipment' . . . and that direct physical loss or damage causes an 'interruption' of 'your' 'renewable energy generating equipment,' 'we' pay for the actual loss of surplus power income incurred during the 'interruption period' applicable to the 'renewable energy generating equipment.'"  At the first step, a causality requirement and link to physical loss clearly exist.  Here, plaintiff suffered a direct physical loss or damage (the burning of 88 solar panels) caused by a covered peril (fire), and the 88 fire-damaged solar panels caused an "interruption" because they could no longer function to generate energy.  The parties do not dispute that the fire triggered this first step of the "energy-generating income" provision.

Second, the policy states, "Coverage for energy-generating income is extended for the increased time of 'interruption' caused by the enforcement of any ordinance, law, or decree that regulates the construction, use, or repair of covered 'renewable energy generating equipment.'"  At this step, in contrast to the first, there is no longer any requirement that the "increased time of interruption" or "enforcement of any law" be caused by direct physical loss.  The causality requirement now only goes one way:  the "enforcement of [the] ordinance, law, or decree" must cause an "increased time of interruption."  According to the text of this provision, the covered physical loss or damage (fire) need not cause the enforcement of the ordinance or law.  All that is required to extend the insurance coverage is that the enforcement of an ordinance or law increase the time of interruption, regardless of the reason that such an ordinance or law was enforced.

Here, the red-tag order was the "enforcement of [an] ordinance [or] law" that caused an "increased time of interruption" to energy-generating equipment.  Therefore, coverage for lost

energy-generating income should be "extended" for the length of that "increased time of interruption"—in this case, the nine days that Array No. 1 and the 41 days that Array No. 2 were offline for inspection, as mandated by the red-tag order.  (Pl. SMF ¶¶ 71-72).[9]

Defendant contends that "Massachusetts case law is clear that an insurer is not obligated to pay for the costs associated with pre-existing code violations for undamaged portions of covered property."  (Def. Mem. 8).  But in each of the cases cited by defendant, the court analyzed the particular language of the contested insurance policy in order to interpret its terms, rather than applying an overarching Massachusetts policy governing insurance contracts.  *See AIG Property Cas. Co. v. Cosby*, 892 F.3d 25, 27 (1st Cir. 2018) (finding that insurance policies are to be "construe[d] . . . under the general rules of contract interpretation[,] . . . begin[ning] with the actual language of the policies, given its plain and ordinary meaning").  Each of the cases involved an insurance policy that, unlike the one at issue here, explicitly imposed a causation requirement (that is, they required that the enforcement of laws be caused by direct physical loss or damage) or contained a specific exclusion.

Thus, in *Tocci I,* a case cited by defendant, a storm damaged a portion of plaintiff's retaining wall.  The town ordered plaintiff to grout the entire wall in order to bring it into compliance with local laws.  *Tocci Building Corp. v. Commonwealth Ins. Co.*, 2007 WL 1830829, at *6 (Mass. Super. Apr. 23, 2007) ("*Tocci I*"), *aff'd*, *Tocci Building Corp., Candlewood Hotel Co., Inc. v. Commonwealth Ins. Co*, 71 Mass. App. Ct. 1120 (2008).  The plaintiff sought compensation for the costs to repair and grout the wall, but the insurer denied the claim because the applicable provision of the policy "explicitly exclude[s] coverage for extra costs associated with ordinance compliance."  *Id.* at *7.  A different provision, which did provide

_____

[9] The insurance policy is not ambiguous, but to the extent that defendant may claim that it is, all ambiguities are to be resolved in favor of the insured.  *Boazova v. Safety Ins. Co.*, 462 Mass. 346, 350-51 (2012).

coverage for the costs of ordinance compliance in limited circumstances, only applied to buildings, not retaining walls. *Id.*

The *Tocci I* plaintiff also sought compensation for 110 days of business-interruption damage, which is similar to the lost energy-generating income provision in NextSun's policy. *Id.* The court granted summary judgment to the defendant on the basis that "the 110-day delay in opening the hotel resulted not from the storm damage, but from the Town's requirement that Tocci bring the retaining wall into compliance with local ordinances." *Id.* at *7.

Defendant urges this Court to similarly find that the delays in permitting plaintiff to resume energy-generating activities resulted not from the fire damage, but from the Town's order to correct poor workmanship and construction deficiencies in the solar panel arrays, and therefore that the delays are not covered. However, *Tocci I* involved very different policy language: that policy only insured "business interruption losses resulting from direct physical loss, damage, or destruction caused by the perils insured against" and excluded "increased losses resulting from the enforcement of ordinances and laws regulating the construction, repair, or demolition of the insured property." *Id.* Unlike the policy in *Tocci,* the Acadia insurance policy covers a broader scope of business interruption (lost income) damages, including when they are augmented by the enforcement of ordinances or laws.

Defendants also cite to *Tocci Building Corp. v. Zurich American Ins. Co.,* 659 F. Supp. 2d 251 (D. Mass. 2009) ("*Tocci II*"), which dealt with a different insurance policy for the same claim as *Tocci I.* There, the court found that the policy, which limited its coverage of repair costs and lost rental income to only those damages stemming from "direct physical loss or damage," did not apply because no physical loss or damage occurred to the portion of the retaining wall that was re-grouted and re-constructed. *Id.* at 259-60. Again, that policy differs

from the policy here, which does not limit the extension of the energy-generating income provision to only those losses caused by direct physical loss or damage.

Defendant also cites to cases from other jurisdictions in which courts affirmed denial of insurance coverage of code- or ordinance- related costs, but those cases, again, involve different policy language.  For example, in *St. Paul Fire and Marine Ins. Co. v. Darlak Motor Inns*, 1999 WL 33755848, at *4 (M.D. Pa. Mar. 9, 1999), *aff'd*, 205 F.3d 1330 (3rd Cir. 2000), a district court held that following a hotel fire, the insurer was not liable for the cost to upgrade undamaged property in order to bring it into compliance with safety codes, because "the fire did not cause the conditions that caused the [hotel] to be out of compliance with code."  The policy specifically limited its coverage of repair costs to "[covered] loss or damage . . . that *causes* the enforcement of any law or ordinance . . . regulating . . . construction."  *Id.* at *2 (emphasis added).  In *Chattanooga Bank Associates v. Fidelity*, 301 F. Supp. 2d. 774, 780 (E.D. Tenn. 2004), the district court analyzed a provision nearly identical to that of *Darlak*:  "In the event of loss or damage . . . that *causes* the enforcement of any law or ordinance . . . regulating the construction or repair of damaged facilities, the [insurer] shall be liable for . . . increased cost of repair."  The court declined to award coverage for the cost of bring the building into compliance with building codes, reasoning that while the fire (the covered peril) may have triggered the *discovery* of the building code violations, it did not "cause" the violations.  *Id.*  Finally, in *61 Jane Street Tenants Corp. v. Great American Ins.*, 2001 WL 40774, at *5 (S.D.N.Y. Jan. 17, 2001), an apartment fire (a covered peril) prompted the discovery of building-wide gas leaks. The district court found that the "all-risk" policy did not cover the cost of extensive repairs to the gas distribution system.  However, the policy in that case specifically excluded coverage for "the cost associated with the enforcement of any ordinance or law which requires any Insured or

others to test plumbing, gas or other building systems." *Id.* at *3.[10]

Furthermore, other cases support the conclusion that coverage exists. In *Regents of Mercersburg College v. Republic Franklin Ins. Co.*, the insurance policy covered "increased cost to repair . . . the property caused by enforcement of building, zoning, or land use ordinance or law. 458 F.3d 159, 162 (3rd Cir. 2006). The Third Circuit reversed a grant of summary judgment to the insurer and found that, following a dormitory fire, renovations to the undamaged portions of the dormitory that were mandated by the Americans with Disabilities Act would be covered by the "increased cost to repair . . . caused by enforcement of . . . ordinance or law" provision of the insurance policy. 458 F.3d at 170.

In *City of Elmira v. Selective Ins. Co. of NY*, the policy covered "loss or damage caused by enforcement of any ordinance or law." 83 A.D.3d 1262, 1264 (N.Y. App. Div. 2011). The court rejected the insurer's argument that the "ordinance or law" coverage did not apply because the covered loss (a windstorm) did not directly cause the enforcement of the ordinance or law. 83 A.D.3d at 1264-65. It found that the only causality requirement flowed the other way (that is, the enforcement of an ordinance or law must cause increased costs for the insured). And it noted: "If defendant wished to limit its coverage to only those situations where the enforcement of an ordinance or law is caused by a covered loss, it could have easily done so through the language of the contract." *Id.* at 1265.

---

[10] Other cases have analyzed insurance policies with similar causality requirements (that is, providing coverage when the direct physical loss from insured peril *causes* the enforcement of a law or ordinance) and concluded that the insured peril *is* the proximate and "but-for" cause of ordinance enforcement, even when the peril does not cause the code violations, because it triggers the *discovery* of code violations. *See, e.g.*, *Commonwealth Insurance Co. v. Benihana of Tokyo, Inc.*, 1997 WL 361617 (N.D. Tex. June 19, 1997) ("[T]he enforcement of the mechanical code by the fire department mandating that all twenty [ventilation] hoods be replaced was caused by the fire since the inspection of the restaurant and enforcement of the code was triggered by the occurrence of the fire in the restaurant."); *Davidson Hotel Co. v. St. Paul Fire and Marine Ins. Co.*, 136 F. Supp. 2d 901 (W.D. Tenn. 2001) (analyzing identical policy language as in *Darlak* and finding coverage for cost of mandated repairs to make building compliant with code *and* business interruption damages during repair period, because covered peril (flood) was the proximate cause of the close inspection that caused the issuance of repair orders).

In short, the plain text of the policy here indicates that, once direct physical damage from a covered peril causes an interruption of energy generation, any increase in the duration of the interruption caused by the enforcement of an ordinance or law extends the lost-income coverage. The enforcement of the ordinance or law does not need to be caused by direct physical loss associated with the covered peril.  The fire caused direct physical damage to plaintiff's solar panels on May 31, 2016, creating an immediate interruption to its energy-generating activities. The red-tag order, which was the "enforcement" of an "ordinance or law," "increased the time of interruption" until June 9 (for Array No. 1) and July 11 (for Array No. 2) by mandating that plaintiff keep its arrays offline until it completed extensive testing.  (Policy at 17).  Thus, as a matter of law, plaintiff has met its burden of showing that the energy-generating income coverage should be "extended" for that increased period of interruption from June 1 to July 11, 2016.

### 3.      Whether the Time Spent Testing and Repairing Falls Under the "Additional Time" Exclusion

The policy contains the following exclusion:  "'We' do not pay for any loss or additional expenses due to any increase in the 'interruption period' caused directly or indirectly by one or more of the following excluded causes or events, regardless of any other causes or events that contribute to the 'interruption period' . . . .  Additional time that would be required to replace or repair any part of covered 'renewable energy generating equipment' due to improvements necessary to correct deficiencies of original construction, erection, or installation."  (Policy at 23).  Defendant contends that all of the time that plaintiff's arrays were offline due to the red-tag order fall into this "additional time" exclusion.

Exclusions from coverage "are to be strictly construed," and any ambiguity in the exclusion "must be construed against the insurer."  *Vappi & Co. v. Aetna Cas. & Sur. Co.*, 348

Mass. 427, 431 (1965).  Here, the "additional time" exclusion, by its own terms, covers only time spent "replac[ing] or repair[ing]" equipment "due to . . . deficiencies of original construction, erection, or installation."  Therefore, all testing of the equipment—which appears to compose a significant portion of the steps required by the red-tag order—does not fall within the exclusion. For example, Bill Morehouse, the Wiring Inspector, required NextSun to evaluate and test every one of the more than 11,000 electrical connections in the arrays, and replace faulty connections where necessary, before he would permit the panels in Array No. 2 to go back online.  (Pl. SMF ¶ 15).  The red-tag order required teams of two people to inspect every "string or row" of panels and to generate a "testing report" with their findings.  (Morehouse Dep. at 33, 44-45).  That survey took a substantial amount of time, and only when the testing yielded a finding of a faulty connector did the inspectors move on to repairing and replacing the panels.  None of the time that plaintiff spent taking these steps would fall into the "additional time" exclusion, because it was time spent testing and inspecting, not replacing or repairing equipment.

In addition, any time spent repairing or replacing equipment that needed fixing for *any* reason other than "deficiencies of original construction, erection, or installation" does not fall within the "additional time" exclusion.  Plaintiff has presented evidence that any number of factors, unrelated to deficiencies of original construction, may have necessitated the repairs and replacements that it conducted over the 41-day course of the red-tag order.  For example, plaintiff had to repair many loose electrical connections.  While defendant contends that they were caused by shoddy workmanship during the installation process, plaintiff contends that well-installed electrical connections may have loosened over time due to everyday exposure to fluctuating weather conditions and fluctuating internal component temperatures from normal use of the solar panel array.  (Pl SMF ¶¶ 90-91; Pl. Ex. 27, Second ADP Report).  In another

example, Fire Chief Scott Wodzinski required plaintiff to repair every single connector on the rooftop that showed "signs of arcing and burn" before he would authorize removal of the red tag. (Pl. SMF ¶ 14; Pl. Ex 6, Wodzinski Dep. at 28).  However, it was impossible to determine whether the "signs of arcing and burn" were caused by the fire or predated the fire.  (Wodzinski Dep. at 36).  Defendant has produced no conclusive evidence that the "arcing and burn" were caused by deficiencies of original construction, rather than by normal wear and tear, weather, or the fire itself.  Finally, some of the mandated repairs involved moving the connectors underneath the panels to prevent future exposure to bad weather, and managing and organizing cables that showed signs of weather damage.  (Morehouse Dep. at 45).  Again, it is not clear that these repairs were necessary to correct deficiencies of original construction; rather, plaintiff implemented them to ameliorate the expected and normal effects of weather damage.

Defendant's contention that there is no coverage under the "additional time" exclusion is problematic because it has not provided any evidence of what portion of the 41-day red-tag order period falls into the exclusion.  Its position appears to be that all of plaintiff's work falls under the "additional time" exclusion, or none of it does.  But that cannot be true.  Again, and at a minimum, all the time that plaintiff spent testing and inspecting the arrays—a substantial portion of its work—would not be excluded.  And all the time that plaintiff spent replacing or repairing equipment damaged by normal wear and tear, weather-based erosion, or the fire itself would not be excluded.  It is certainly possible that the excluded work (time spent replacing and repairing parts that were defective since installation) cannot be separated from the covered work (time spent testing, inspecting, and fixing parts that became defective through no fault of plaintiff) because plaintiff's engineers may have done the testing work and the replacement/repair work contemporaneously.  But it is enough to conclude, for present purposes, that a substantial portion

of the work that plaintiff did over the 41-day "red tag period" in order to meet the Town's requirements does not fall within the "additional time" exclusion.  Defendant has not met its burden to show that the exclusion applies to any discrete period of plaintiff's claim for lost energy-generating income.  Under a strict reading of the "additional time" exclusion, it must be construed against the insurer.

In short, coverage for lost energy-generating income is extended for the increased time of interruption caused by the Town's red-tag order—that is, 9 days for Array No. 1 and 41 days for Array No. 2.  The "not in force at the time of loss" exclusion does not bar plaintiff's claim, because the underlying laws authorizing the red-tag order were in force at the time of the fire loss.  Nor does the "additional time" exclusion bar plaintiff's claim, because defendant has not provided evidence that any portion of the 9- and 41-day "red tag periods" were spent working on the excluded activities, "repair and replace[ment]" of deficiencies of original construction.  Summary judgment will therefore be denied as to that portion of defendant's motion.

### B.    Breach of the Implied Covenant of Good Faith and Fair Dealing

Defendant seeks summary judgment on Count 2, breach of the implied covenant of good faith and fair dealing, because there is no evidence that defendant acted in bad faith during its dispute with plaintiff over the insurance policy.

In Massachusetts, "every contract is subject to an implied covenant of good faith and fair dealing."  *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 473 (1991).  The covenant provides that "neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  *Id.* at 471 (quoting *Drucker v. Roland Wm. Jutras Assocs.*, 370 Mass. 383, 385 (1976)).  The scope of the covenant is only as broad as the contract between the parties, and the implied covenant does "not create rights or

duties beyond those the parties agreed to when they entered into the contract." *Curtis v. Herb Chambers I-95, Inc.,* 458 Mass. 674, 680 (2011); *see also Ayash v. Dana-Farber Cancer Inst.*, 443 Mass. 367, 385 (2005).

Typically, "a breach of the implied covenant involves 'bad faith' conduct 'implicating a dishonest purpose, consciousness of wrong, or ill will in the nature of the fraud.'" *Targus Group International, Inc. v. Sherman*, 76 Mass. App. Ct. 421, 435 (2010). The fact that an insurer contests coverage, without more, is not sufficient to prove a breach of the implied covenant of good faith and fair dealing, even if the insurer's position proves to be incorrect. *Nagel v. Provident Mut. Life. Ins. Co. of Philadelphia*, 51 Mass. App. Ct. 763, 768-69 (2001).

Here, the parties dispute very few of the facts concerning defendant's handling of the claim. Defendant consistently communicated with plaintiff over e-mail and telephone about the status of the claim over many months, and maintained a detailed record of relevant claim information and expert reports, including those submitted by plaintiff. Wallace Nichols, the assigned claims adjuster, sought the advice of his supervisor, in-house counsel, and outside counsel in an attempt to resolve the parties' disagreement. There is no evidence that defendant took any dishonest or deceitful actions to deprive plaintiff of the benefit of the policy. Instead, it denied plaintiff's claim in writing, without excessive delay, in a manner that allowed plaintiff to preserve its claims in this lawsuit. As the Appeals Court found in *Nagel*, the incorrect denial of an insurance claim, without more, does not rise to the level of bad faith or unfair dealing. 51 Mass. App. Ct. at 769. Defendant's motion for summary judgment on Count 2, breach of the implied covenant of good faith and fair dealing, will therefore be granted.

### C.   Unfair and Deceptive Trade Practices in Violation of Mass. Gen. Laws ch. 93A, 176D

Defendant also seeks summary judgment on Count 3, which alleges unfair and deceptive

trade practices in violation of Mass. Gen. Laws. ch. 93A and 176D.  Chapter 93A, § 2 provides

that "unfair or deceptive acts or practices in the conduct of any trade or commerce" are unlawful.

Chapter 176D, § 2, makes it unlawful for insurance companies to engage in "any trade practice

which is . . . an unfair method of competition or an unfair or deceptive act or practice in the

business of insurance."  Chapter 176D, § 3, defines "unfair methods of competition and unfair or

deceptive acts or practices in the business of insurance."  Mass. Gen. Laws ch. 176D, § 3(9) and

ch. 93A together require that an insurer must conduct prompt and reasonable investigation of

claims, act promptly in affirming or denying coverage of claims, and promptly pay claims, or

make a reasonable offer of settlement, once liability has become reasonably clear, among other

obligations.

To determine whether a business practice is unfair under Chapter 93A, the court must

consider "(1) whether the practice . . . is within at least the penumbra of some common-law,

statutory, or other established concept of unfairness; (2) whether it is immoral, unethical,

oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or

competitors or other businessmen)."  *PMP Associates, Inc. v. Globe Newspaper Co.*, 366 Mass.

593, 596 (1975).  In cases involving insurance disputes, liability under Chapters 176D and 93A

may be triggered by "an absence of good faith and presence of extortionate tactics."  *Guity v.*

*Commerce Ins. Co.*, 36 Mass. App. Ct. 339, 344 (1994).  For example, courts have upheld

findings of liability under Chapters 93A and 176D where an insurance company refused to settle

a theft claim based on its unfounded suspicion of the claimant's veracity; had a company-wide

policy of refusing to settle all but small claims prior to litigation; or refused to provide coverage

after a judicial determination that coverage applied.  *Id.* (citing *Wallace v. American Mfrs. Mut.*

*Ins. Co.,* 22 Mass. App. Ct. 938, 939 (1986); *Whyte v. Connecticut Mut. Life Ins. Co.*, 818 F.2d

1005, 1011 (1st Cir. 1987); *Shapiro v. American Home Assur. Co.*, 616 F. Supp. 906, 918-19 (D. Mass. 1985)).

However, Chapters 93A and 176D do not impose liability in cases of good-faith disputes over insurance coverage in which "liability was not reasonably clear." *Guity*, 36 Mass. App. Ct. at 343. Such disputes do not constitute unfair or deceptive trade practices, even when a court ultimately overrules insurer's denial of the claim, as long as the insurer's denial was made in good faith, relied upon a plausible interpretation of the policy, and was not otherwise immoral, unethical, or oppressive. *See Guity*, 36 Mass. App. Ct. at 343 ("A plausible, reasoned legal position that may ultimately turn out to be mistaken—or simply . . . unsuccessful—is outside the scope of the punitive aspects of the combined application of c. 93A and c. 176D."); *Bos. Symphony Orchestra, Inc. v. Commercial Union Ins. Co.*, 406 Mass. 7, 15 (1989) ("In good faith, [the insurer] relied upon a plausible, although ultimately incorrect, interpretation of its policy. There is nothing immoral, unethical or oppressive in such an action . . . . We hold that [the insurer] did not engage in unfair or deceptive acts."); *New England Envtl. Technologies v. American Safety Risk Retention Grp., Inc.*, 738 F. Supp. 2d 249, 259 (D. Mass. 2010) ("Because [the insurer] based its denial on a plausible, albeit erroneous, interpretation of the policy language, its conduct did not constitute a violation of Chapter 176D."). If an insurer, operating under this good-faith belief that it does not need to make a payment to a claimant, "asserts the point, and offers to take active steps to resolve the dispute," that is not an unfair settlement practice under Chapter 176D. *Premier Ins. Co. of Massachusetts v. Furtado*, 428 Mass. 507, 510 (1998).

Here, plaintiff has not provided evidence from which a reasonable factfinder could conclude that defendant's denial of coverage was anything more than a good-faith dispute, based

on a plausible interpretation of the policy.  Plaintiff asserts the following evidence of unfair

practices:  defendant did not pay undisputed damages to plaintiff for nearly a year; it frequently

changed its stated reasons for denying the claim in its communications with plaintiff;[11] its

employees lacked understanding and experience with law and ordinance coverage;[12] certain

documents submitted by plaintiff, such as the ADP expert reports, were not circulated to all the

relevant employees; and defendant has never before handled an ordinance or law claim

submitted under its energy-generating income provision.  (Pl. Opp. at 15-18).

Even when viewed in the light most favorable to plaintiff, those facts are not sufficient to

support an inference of bad-faith conduct.  Rather, they suggest that defendant's employees

were, at worst, struggling with the handling of a rare type of claim, which they attempted to

resolve by seeking advice from supervisors and outside counsel.

The facts presented by plaintiff are similar to those in *Boston Symphony Orchestra*, in

which the court affirmed a grant of summary judgment to the insurer on a Chapter 93A claim

because "[t]here was no applicable precedent with regard to the coverage issue . . . when [the

insurer] denied coverage" and "the insurer asked for, received, and relied upon an opinion from

outside counsel regarding its liability."  406 Mass. at 14.  Those facts supported an inference that

the insurer's interpretation of its policy, although ultimately incorrect, was "not unreasonable,"

with "no evidence of any bad faith or ulterior motives in [the] disclaimer of liability."  *Id.*

Similarly, here, there was no applicable precedent for any "law or ordinance" claim submitted

---

[11] At various points, defendant has asserted that the red-tag order was not the enforcement of an "ordinance,
law or decree;" that the Town of Littleton officials were not "authorities having jurisdiction" to issue an ordinance,
law or decree; that the "ordinance or laws" were not in force at the time of the loss; that the lost income during the
"red tag period" was not covered because the red-tag order stemmed from defective workmanship, not fire damage;
and that the "additional time" exclusion barred coverage.

[12] Wallace Nichols, the claims adjuster, admitted that he was "not familiar with this type of coverage at
all."  (Pl. SMF ¶ 62).  Susan Beck, defendant's in-house counsel, stated that she "did not feel qualif[ied] to
determine if there is coverage."  (Pl. SMF ¶ 76).

under the energy-generating income provision—plaintiff was apparently the first policyholder in the company's history to submit such a claim.  Employees sought the advice of outside counsel, and they relied on counsel's opinion in denying the claim.  These facts support an inference that defendant's interpretation of its policy, although erroneous, was plausible and supported by good faith.

In sum, there is insufficient evidence that defendant engaged in unfair and deceptive trade practices or unfair settlement practices when it denied plaintiff's insurance claim.  Even when viewed in the light most favorable to plaintiff, the facts suggest that defendant, in good faith, relied upon a plausible, although ultimately erroneous, interpretation of its energy-generating income policy.  Defendant's motion for summary judgment on Count 3, unfair and deceptive trade practices in violation of Mass. Gen. Laws ch. 93A, §§ 2 and 11 and ch. 176D, will therefore be granted.

## IV.   Conclusion

For the foregoing reasons,

1.  Defendant's motion for summary judgment is DENIED as to Count 1 (breach of contract); GRANTED as to Count 2 (breach of the implied covenant of good faith and fair dealing); and GRANTED as to Count 3 (unfair and deceptive trade practices in violation of Mass. Gen. Laws ch. 93A, 176D).

2.  Plaintiff's motion for summary judgment on Count 1 (breach of contract) is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor, IV
Dated:  September 30, 2020                    Chief Judge, United States District Court